UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| **CHRISTIAN THOMPSON,** § | |
| § | |
| Plaintiff, § | |
| § | **CIVIL ACTION NO. 4:23-CV-297** |
| v. § | |
| § | |
| **THE HARRIS CENTER FOR** § | |
| **MENTAL HEALTH**, § | **JURY TRIAL DEMANDED** |
| § | |
| Defendant. | |

# PLAINTIFF'S ORIGINAL COMPLAINT

**Christian Thompson**, Plaintiff ("Thompson" or "Plaintiff") brings this lawsuit against the Harris Center for Mental Health, Defendant ("Center" or "Defendant"), and for cause of action against it would show the Court as follows:

In a letter dated June 25, 2021, the Center notified Thompson that he was fired, effective June 18th, for alleged "job abandonment." Thompson did not abandon his job. He experienced a serious diabetic episode while he was visiting family out of the country. Thompson's health and the travel restrictions imposed by COVID-19 left him unable to return to Houston as expected. The Center knew of Thompson's medical emergency and his need for medical leave, but it fired him anyway.

The Center's decision to fire Thompson is unlawful. It is disability discrimination based on Thompson's actual or perceived disability. And it is a violation of Thompson's rights under the Family Medical Leave Act. If Thompson did not have diabetes, or if he did not need serious medical care, he would not have been fired.

## I.     PARTIES

1. Plaintiff Christian Thompson is a resident of the State of Texas. Plaintiff worked for the Center in Houston, Harris County, Texas, and the decision to fire him was made in Houston, Harris County, Texas.

2. Defendant, The Harris Center for Mental Health, is a governmental entity whose principal office is in Houston, Harris County, Texas. Defendant may be served with process by serving its Chief Executive Officer, Wayne Young, located at 9401 Southwest Freeway, Houston, Texas 77074.

## II.    JURISDICTION and VENUE

3. Plaintiff brings this suit under the Americans with Disabilities Act, as amended, and the Family Medical Leave Act. This Court has jurisdiction of this case according to 28 U.S.C. §§ 1331 and 1343.

4. The practices alleged herein were committed within the jurisdiction of this Court. The amount in controversy is within the jurisdictional limits of this Court.

## III.   ADMINISTRATIVE EXHAUSTION

5. All conditions precedent to the filing of this action have been met by Plaintiff in that he timely filed his complaint with the Equal Employment Opportunity Commission ("EEOC") and has received his right-to-sue letter from the EEOC to pursue his claims of disability discrimination.

6. Plaintiff filed a Charge of Discrimination with the TWC-CRD and the EEOC on April 19, 2022.

7. On or about November 1, 2022, Plaintiff received his Notice of Right to File a Civil Action issued by the EEOC entitling him to file suit based on his disability discrimination claim.

8. The filing of this lawsuit has been accomplished within ninety (90) days of Plaintiff's receipt of the notice from the EEOC.

### IV.   FACTUAL BACKGROUND

9. The Harris Center for Mental Health (The Center) hired Thompson in March 2017 for the position of Service Coordinator.

10. Thompson was a good worker. He consistently got solid performance reviews. He received praise from the Program Director, Annie Cuba, for his excellent customer service to clients and their families. The Center gave him an achievement award for Best in Document Production. He never received or deserved any disciplinary infractions and had no unauthorized absences.

11. In March 2021, Thompson asked for and received vacation leave to travel to Nigeria from May 1st through June 14th.

12. This was an important visit for Thompson. He was travelling to his hometown of Uyo, Nigeria, for the first time since 2015. Sadly, his brother Edet Thompson passed away in 2020 but he was not able to visit due to the COVID-19 pandemic lockdown. So in May 2021, he needed to travel to Uyo to handle his brother's estate and grieve in person with his family for the first time.

13. Thompson has Type-2 diabetes. Due to a number of factors, including stress, he experienced severe high blood sugar while in Nigeria. He experienced dizziness, blurry vision, heavy breathing, loss of balance, fainting, diarrhea, and impaired cognitive function. His condition got so bad that he was admitted to St. Athanasius' Hospital on June 3, 2021.

14. Thompson remained at St. Athanasius Hospital and received medical treatment for his diabetes through June 10th.

15. On June 10th, Thompson was discharged from the hospital but was not yet cleared for international travel. He continued to receive ongoing outpatient care, including follow-up treatment and physiotherapy, through June 16th.

16. Importantly, Thompson's treating physician, Dr. Emmanuel Akpangobong, noted that even when he traveled home he would "need to continue with follow up treatment with his doctors in the US."

17. On June 13th, at approximately 9:00 pm Nigeria time, Thompson emailed his supervisor at the Center, Ericka Degracia the following: "I will not be able to return to work tomorrow 06/14/2021 and subsequently due to ill health. I will furnish you with a tentative date once cleared by my doctor."

18. The Center knew that Thompson would not be present on June 14th or after that, until he was cleared by his doctor.

19. This is proper notice that Thompson was not abandoning his job, but rather, that he had experienced a medical emergency and needed time to travel home and recover.

20. This notice is consistent with The Center's policy and the Family Medical Leave Act (FMLA), which require that, when "advance notice is not possible, such as for a medical emergency, notice must be given as soon as practicable[.]"

21. Since Thompson had no way of knowing when he would be fully released for travel, he provided The Center with as much notice regarding the duration of his leave as possible.

22. Thompson's notice triggered an obligation on the part of The Center to determine whether any request for leave, paid or unpaid, meets the requirements for FMLA leave, whether he explicitly asked for FMLA or not.

23. According to the Center's policy, and consistent with the FMLA, the Center should determine an employee's eligibility for FMLA leave whenever an employee requests any type of leave, paid or unpaid, for the health condition of the employee that causes the employee to be absent for three or more days.

24. This process was made more challenging because of the difficulties of international communication. Cellular service in Uyo, Nigeria, is bad. Although The Center claims that it tried to email Thompson on June 14, 15, 16, and 17, he never received those emails.

25. When he was finally medically cleared to travel home on June 16th, he still could not leave the country without a negative COVID-19 test. Thompson was able to get a COVID-19 test on June 17th.

26. Thompson did not receive his negative COVID-19 test result until June 18th.

27. Thompson could not schedule a return flight to Houston until June 19th.

28. Thompson tried to communicate this information to Ms. Degracia via email and phone calls, but he was unsuccessful because of the lack of cellular service in Uyo.

29. Thompson returned to Houston on Sunday, June 20th.

30. The 17-hour international flight worsened Thompson's condition. When he got home he went to bed to rest. The fo1lowing morning, June 21st, Thompson tried to get an appointment with his doctor in Houston, but was not able to get in until June 23rd.

31. Thompson called Ms. Degracia on June 21st. She did not answer, so he left a message telling her that he was still sick and that he was scheduled to see his doctor on June 23rd.

32. Ms. Degracia never called Thompson back.

33. On June 23rd, Thompson's physician, Dr. Albert Oguejiofor, noted that he would be out from June 23rd through July 1st due to "uncontrolled diabetes" and "chronic kidney disease."

34. The Center acknowledges that it received Thompson's doctor's note on June 23rd via fax.

35. It is true that Dr. Oguejiofor's note does not address the dates between June 15th- 22nd, but it is also true that Thompson was under the care of Dr. Akpangobong in Nigeria until June 16th, that he had to wait to travel back home until June 19th, and that he was waiting until June 23rd to see Dr. Oguejiofor.

36. Thompson was not under a doctor's care from June 16th through June 23rd because that was not possible.

37. If The Center had questions about Thompson's whereabouts or medical status between June 15-22, it should have asked Thompson when he returned to Houston.

38. Ms. Degracia should have returned Thompson's call if she had questions.

39. The Center should have followed up with Dr. Oguejiofor if it had questions.

40. The Center shut off Thompson's work email account on June 22nd. It should not have done that if it wished to stay in contact with him via email and ask questions. But none of those things happened.

41. Instead of returning Thompson's calls or contacting him or his doctor directly, The Center notified Thompson on June 30th that he was fired with a letter dated June 25th, for supposed "job abandonment," before he was cleared to return to work following his drawn-out diabetic episode.

42. Thompson did not abandon his job. He got sick while out of the country and needed serious medical care.

43. Thompson gave The Center all the information it needed on June 14th to know that he was dealing with a serious health condition, that he could be absent for an extended period of time, and that he needed FMLA leave.

6

44. The Center never discussed FMLA with Thompson and fired him before he was cleared to return to work.

45. The Center knew that Thompson had diabetes, or at the very least, the Center perceived Thompson as having a physical impairment.

46. Two days before firing Thompson, the Center knew that he was dealing with "uncontrolled diabetes" and "chronic kidney disease." It was not until the Center received Thompson's doctor's note from Dr. Oguejiofor that it decided to fire him.

47. The reason given for the termination - that Thompson somehow failed to tell the Center about his absences, is false and an attempt to cover up the real reason - disability discrimination and FMLA interference.

48. The Center fired Thompson because he had a serious diabetic episode and needed time off to recover.

## V.   COUNT ONE:
## DISABILTY DISCRIMINATION IN VIOLATION OF THE ADA

49. Plaintiff incorporates by reference the preceding paragraphs as set forth herein.

50. Plaintiff is an individual with a disability.

51. Plaintiff has a physical impairment – Type-2 diabetes - that substantially limits a major bodily function, his endocrine system. According to ADA regulations, diabetes should "easily be concluded" as substantially limiting endocrine function. 29 C.F.R. § 1630.2.

52. Defendant regarded Plaintiff as having a physical impairment.

53. Defendant, by and through its agents and employees, has intentionally engaged in the aforementioned practices, policies, customs, and usages made unlawful by the ADA.

54. Defendant has violated the ADA by discriminating against Plaintiff because of his actual or perceived disability.

## VI.   COUNT TWO: INTERFERENCE IN VIOLATION OF THE FMLA

55. Plaintiff was an employee that was eligible for FMLA: he had been employed by the Defendant for at least 12 months, for at least 1,250 hours of service during the 12–month period immediately preceding the commencement of the leave, and was employed at a worksite where 50 or more employees were employed by the Defendant within 75 miles of that worksite.

56. Defendant was subject to FMLA requirements because it is engaged in commerce (or in an industry or activity affecting commerce), and it employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year.

57. Plaintiff was entitled to leave because of a serious health condition that made him temporarily unable to perform the functions of his job and required continuing treatment by a health care provider with inpatient hospital care.

58. Plaintiff gave proper notice of his need and intent to take FMLA leave.

59. Defendant denied him the benefits to which he was entitled to receive under the FMLA.

## VII.   DAMAGES

60. As a direct and proximate result of the aforementioned acts, Plaintiff has suffered economic loss, compensatory loss, and mental anguish.

## VIII.   ATTORNEY'S FEES

61. Defendant's actions and conduct as described herein and the resulting damage and loss to Plaintiff has necessitated Plaintiff retaining the services of SHELLIST | LAZARZ | SLOBIN LLP, 11 Greenway Plaza, Suite 1515, Houston, Texas 77046, in initiating this proceeding. Plaintiff seeks recovery of reasonable and necessary attorney's fees.

## IX.   JURY DEMAND

62. Plaintiff demands a trial by jury.

## X.     PRAYER

63. Plaintiff respectfully prays that Defendant be cited to appear and answer, and that on final hearing of this cause Plaintiff obtain the following relief:

   a. Judgment against Defendant for actual damages sustained by Plaintiff as alleged herein;
   b. Pre-judgment interest at the highest legal rate;
   c. Post-judgment interest at the highest legal rate until paid;
   d. Back-pay;
   e. Front-pay;
   f. Injunctive relief;
   g. Instatement;
   h. Damages for mental pain and mental anguish;
   i. Attorney's fees;
   j. All costs of court expended herein;
   k. Such other and further relief, at law or in equity, general or special, to which Plaintiff may show he is justly entitled.

Respectfully submitted,

**SHELLIST | LAZARZ | SLOBIN LLP**

*/s/ Paul R. Harris*
**Todd Slobin**
Federal ID No. 22701
State Bar No. 24002953
**Paul R. Harris**
Federal ID No. 897365
State Bar No. 24059905
pharris@eeoc.net
11 Greenway Plaza, Suite 1515
Houston, Texas 77046
(713) 621-2277 – Telephone
(713) 621-0993 – Facsimile

**ATTORNEYS FOR PLAINTIFF**